Court of Appeals, we have three cases to be submitted today on oral argument beginning with Southern Insurance Company v. Affiliated FM Insurance Company. Mr. Webb. May it please the court. I'm Dan Webb. I represent Southern Insurance Company along with Mr. Doss, Wayne Doss, over here at the council table. And I would like to begin by discussing basically the principles on which the Southern Insurance Policy is founded. And it, like any other property policy, is an indemnity policy, an indemnity policy that pays for uncompensated loss. It pays for uncompensated loss and under both the law and the policy, and quite frankly the entire structure of the policy is built around the obligation of the insured to repair, and that is itself to have an uncompensated loss. And the record on appeal at 14. Well, you know, if you took that argument to the extreme, an uncompensated loss and its duty to repair, it's almost like you're implying that USMAA had to repair this building before you would have even paid for it. Well, that's not . . . Your Honor, I understand the question, I believe. That's not the way the policy works. I understand that, but that seems to be the tenor of your client's position. You know, you refused to pay for the policy. You filed a declaratory judgment very, very early, and that building is sitting there unrepaired. Well, the building was already being worked on for several months at the time we filed the declaratory judgment action, Your Honor. And going back in the sequence of events, the policy was purchased in roughly 2009 and renewed. There's no question it was delivered to USMAA, so its terms were known and they're charged with knowledge of it. And the knowledge of that policy, the loss payment provision specifically says that the amount of the covered loss will be determined by the valuation condition in the policy. But the reason you refused to pay when the proof of loss was given you, Southern Insurance, was because of this other policy by Affiliated. Was that the reason given? No, Your Honor. Then why did you refuse the proof of loss? The proof of loss was refused because there were binding contracts approved by the Board of Trustees of the Institutions of Higher Learning of the State of Mississippi for another entity to repair this building. And at that point in time, once again backing up to the February 10th date of the tornado, you go from February 10th to the date of the tornado as early as March and April, there were discussions with USMAA and there were discussions with USA. I assume all of this is in the record. Yes, sir. It is. And there were discussions with AFM, their insurer, by my client in an attempt to try to reach some accommodation where we could either we alone or they alone or in some combination of agreement between the insurers could simply handle the matter and not have USMAA involved in litigation. If it ultimately came to that, let the insurers resolve the questions of who should pay what, if anything, at the end of the process. AFM, we were appointed by USMAA to AFM at all times. USMAA did never submit any contracts or anything else to indicate payment. If they had signed a contract rather than USM with B.W. Sullivan and Finlow and the architect and those bills had been submitted in normal course, in the normal course, they would have just handed them off, I suspect, to the insurance company at that time. And assuming there was no problem with two contractors being hired on this job, if that had occurred, we would be in an entirely different situation. There was no point in time that my client ever dissuaded USMAA from doing anything like that. In fact, we were discussing with them during this entire four-and-a-half-month period of time up until July trying to resolve these issues. And then on July 22nd, and this is in the record, July 22nd, 2013, USM entered into binding contracts. Presumably, USM cannot enter into contracts unless they have the authority to do so. And that authority was confirmed when the next month, I believe it was either the 13th or the 23rd, but I believe it was the next month, the Board of Trustees considered those contracts and approved them. And the presumption is that they had authority to do that and they wouldn't approve anything that USM didn't have authority to do. And from that point forward, there was no basis to conclude that anyone but USM would pay for the full repair and replacement because that was the term of the, well, actually, those were the terms of both construction contracts. Let me give you the timeline I'm thinking about and you tell me where I'm wrong. All right, sir. The tornado occurred in February of 2013. Demand was made by USMAA on Southern Insurance with proof of loss in November 13. Southern Insurance refused to pay in November 13. And between then and July 14, USM called on its insurer affiliated after you filed your action in December of 13. Am I wrong in any of my dates or timeline there? I believe that timeline is correct, Your Honor, in terms of those events, but there are other events taking place in that period of time, not the least of which is going back, we have the agreements binding USM to pay. We have the Board of Trustees approving it. And then in June of the following year, while the case is in litigation, USMAA, not AFM, but USMAA, tells us that they have the dog in the hunt, so to speak, and literally that was what was said because we took that to mean, and I think it was clearly intended to tell us, that USMAA had no claim. No, they didn't tell you. You weren't aware they had made an assignment of their rights? They had not at that time, Your Honor. You didn't understand that to be we don't have a dog in this fight? Well, they made the assignment on the 28th of July, six weeks later. Because of that assignment, if your client is required to pay something, there's not going to be any double recovery. You're relying on this valuation provision that says the value is nothing if others pay for repairs or replacements. That's clearly aimed at preventing a double recovery. That's not going to happen here. Why should we apply the provision in this context? Well, if you answer the question about the assignment, first and foremost, if they had no dog in the hunt. It's invalid. Well, it is invalid, but at the time the assignment was made, even if you assumed that it was valid, they had nothing to assign. There was nothing to assign because the repair was being done fully and completely by another entity. AFM has another. But if we assume the assignment's valid, so there's not going to be a double recovery, because anything the Alumni Association gets is going to go to the other insurance company, essentially. Why should we apply this no valuation provision? Because the valuation provision determines whether or not my client owes USMAA. If you assume the assignment is valid, then it would be subject to the same defenses as it would to USM. AFM's participation in this is really unnecessary to make the decision as to whether there's an obligation to our insurer. That's a totally separate issue, Your Honor. In point of fact, the same result would obtain in this case if AFM had no coverage at all. The same result would obtain in this case as we are suggesting to the court, applying the policy language, even if the other insurance language was applied and AFM was here. Because ultimately, the policy resolves itself down to, even in the context of other insured application, that we only pay the amount of covered loss. And the insured USMAA, Your Honor, is in the circumstance where someone else pays, is relegated to nothing on tenants improvements and betterments. And AFM is a stranger to that situation. AFM also, secondarily, is a volunteer, because they've maintained from the very beginning, all the way up through and including this litigation, that they owe nothing, but at the same time, they say that they voluntarily paid. I would also like to point out- We accept your argument on the valuation provision. Anytime you have multiple insurers that could be responsible, no one's going to want to pay, right? It's just going to have an incentive to delay, because as soon as someone pays the first time, this provision's going to kick in that, oh, it's already been paid by the other insurance company, so another is paid, and the other insurance company's going to be off the hook. It just seems to create some really bad incentives, and no one's ever going to get . . . You're going to have to go to court every time there's two insurers covering the same loss. I don't believe that that result obtains here. There's really not, as I'm sure the court is aware. Well, if the university had not paid for the repairs, what would this . . . And this goes back to Judge Barksdale's question. Would you pay? If the university had not . . . If it were still sitting there unrepaired today. We would pay under Option 2. We would pay under Option 2 of the valuation of tenants' improvements and betterments if it were still sitting there unrepaired today. If it were repaired by USMAA, we would repair under Option 1. There are three options. They're not provisions in the policy that say this is the limit that we will pay if we don't do certain things. It's not a limitation on coverage. It's just a relegation of the amount that will be paid under certain circumstances. We did not control whether USMAA actually attempted to repair the property. Mr. Webb, before you sit down, I just want, again, to understand the record better. The policy that you . . . I'm going to just call them the Alumni Association so we can move on a little quicker. The Alumni Association leased the building from the university. The Alumni Association, as a requirement in the lease or condition in the lease, had to acquire insurance. And it acquired it from Southern Insurance, your client. The Alumni Association was also supposed to make sure that the university was a named insured in that policy. Is there anything in the record as to why the University of Southern Mississippi isn't a named insured in the Southern Insurance policy? Your Honor, honestly, I don't recall specifically one way or another about that particular point. But if I may, they were not . . . I believe that there . . . Actually, there is. I believe in Mr. Tom Hamilton's affidavit that was submitted in support of our motion that starts at Record on Appeal 1112, which discusses these issues, I believe, subject to my verifying it, talks about that. Well, you could maybe tell us about that. You've got eight minutes of rebuttal. Yes, sir. Tell us about that. Yes, sir. You've saved time for rebuttal, Mr. Webb. Thank you. Mr. Curry. May it please the Court. Basically, we think Judge Sterritt, with respect to their appeal, properly framed the issue. It's basically this. Should Southern be permitted to avail itself of the Nothing Clause after it breached its insurance contract with the Alumni Association by failing . . . And, Judge Sterritt's words, by failing to honor its contractual obligations to the Alumni Association, and as a result of that breach, forced my client, AFM, to step in and honor its contractual obligations to its insured university. Keeping in mind that the event of AFM paying its insured, only arose as a result of Southern's breach of contract. And, your questions were right on point, Judge Barksdale, about why did Southern reject the proof of loss and deny the claim. You know what the answer was? Because the university had entered into some contracts for repair. I defy them to find anywhere in that policy where it says that that is a ground for denying a claim. It is not in there. As a matter of fact, there are five separate provisions where Southern breached its contract with the university. And, we find in those provisions an absolute contradiction to the position they're taking that the Alumni Association was required to make the repairs. Absolutely nowhere in the policy that says that. As a matter of fact, rejecting the claim because the university had entered into a contract for repair, that in and of itself is a breach of contract. Because they had no right to deny on that basis. Now, what was or what were the five breaches? You start out with the insuring language of the policy, Southern's policy. They say, we will pay for direct physical loss to this covered building if it's damaged as a result of a covered loss. Well, that's no question. That occurred. Then, under the loss payment provision of the policy, this provides Southern with several options to decide how they're going to make the payment. They've already agreed that they will pay. But, they say, well, we've got some options that, at our discretion, we'll choose which one of these to determine how we're going to pay you. And, let's go through those. Now, again, it says, we will. Southern says, Southern will, at our option, do one of the following. First, it says, pay the value of the damaged property. That's one. It says, we will do that, or we will pay the cost of repairing or replacing the damaged property. They didn't do that, but that was an option. But, here is what is so telling. This next provision, this next option that runs totally afoul of any position that the Alumni Association was required to repair. A third option was that Southern itself could opt to repair, rebuild, or replace the property. They had that option. They had a fourth option. They had an option that we may adjust the claim with the owner of the building and pay the owner of the building, and we'll apply that as a credit against your claim. Nowhere in there does it say Alumni Association was required to repair that property. It says just the opposite. Southern is saying, we may repair and replace, or the owner may repair and replace, and we have the option of dealing with the owner and adjusting the claim accordingly, your claim. Now, here's the third breach. In the Lost Payment Clause, again, it's written in the Lost Payment Clause, Southern said, we will. We will determine the value of the cost to repair or replace in accordance with the valuation provision. They obligated themselves to do that. And the fourth, they said, we will give you, Alumni Association, notice of our intentions on what option we choose within 30 days after you submit your sworn proof of loss. They didn't do that. They just denied it. But then the fifth option, or the fifth, excuse me, the fifth duty that Southern had was this. They say, we will determine the value of the damage to the tenant's improvements or betterments. There's two different ways. At actual cash value, if the Alumni Association makes the repairs promptly. If. But then it goes on and says, but if the Alumni Association does not make the repairs promptly, we'll determine the value of the damage to the improvements and betterments in accordance with a stated formula. And that formula, I don't need to go into it, but it's a stated formula in the valuation provision that is specifically tied to the lease agreement between the Alumni Association and the university. Well, this paragraph seven valuation that's part of what you're talking about also says they will pay nothing if others pay for repairs or replacement. And that goes to the heart of Judge Starrick's ruling, Judge Barksdale, because at the time the Alumni Association submitted its proof of loss, nothing had been paid. Nothing had been paid to anybody for the repairs to the Overtree House. Now keep in mind, Your Honor, I asked about a question going to when the repairs were made. The repairs were completed in May of 2014, what, seven months after Southern denied the claim. But at the time the proof of loss was submitted, nothing had been paid. At the time Southern rejected the proof of loss and breached the policy, nothing had been paid. At the time Southern filed its declaratory judgment action just five days after denying the claim, nothing had been paid. In fact, payment was not made until after Southern breached the policy, and that occurred on two occasions, February of 2014 and October of 2014. So over a year, over a year after the tornado and well after Southern breached the contract. And legally, legally it was their breach that gave them the opportunity to raise the nothing clause in the first place. If they had not breached the contract, if they had done everything they said we will do, they never would have had the opportunity to raise. They'd sat back and waited. They sat back and waited. Well, but that allows, and again, you know, we'll have to look at the summary judgment record on these cross motions, but they do have this other insurance provision in their policy just as you have it in yours. Again, we'll just have to see what were the bases given for Southern's refusal to pay, but you keep talking about breach of contract, but that's what they're in here on a declaratory judgment for, to determine did they breach their insurance policy. Judge Sterrett ruled they did. That's what he held. But not enough of a breach to make them totally liable for the claim. Well, when you breach, you're talking now about I believe your Honor is going to the other insurance clause. Yes. All right. That goes to our cross appeal. And our cross appeal is basically. Let me ask you before you get into it. Yes, Your Honor. If you're right on your cross appeal that the district court made a mistake in finding that these were mutually repugnant policies and so there shouldn't be a pro rata, is the result that Southern would pay the entire amount? Is that the. That's correct, Your Honor. Is that what you're asking for? That's correct. And our answer to your question goes, I believe. Judge Costa, I can't remember if it was your question or Judge Bosh or your question, about what the lease between the parties required. Well, I asked about the lease where the Alumni Association was supposed to make sure that Southern was, the University of Southern Mississippi was named insured on the policy with Southern Insurance. Correct. Which apparently did not happen. It did not happen. We wouldn't be here. Don't know, don't know why the broker or the agent didn't do it. But those terms are very significant in determining priority of coverage. Now, the cases we cited in our brief all point, including a Mississippi Southern District case, all point the court in the direction that when determining priority of coverage where you have two insurers with two different insurers, but they insure the same risk, basic risk, that the courts can look to the underlying agreement between the insurers to determine priority of coverage and ignore the other insurance provisions in the policies. Now, in most telling is one of the cases that we cited. It is the Connex-Minolta case. It's a Fifth Circuit case applying Louisiana law, but you had a situation where you had a blanket policy on the one hand and a specific limits policy on the other hand. And the court said, this court held, that under those circumstances, it was clear that it was the intention to give the specific limits priority in coverage. They go first and the blanket policy goes second. Now, that's legal authority. But with respect to the underlying agreement between the university and the Alumni Association, Your Honor, as you pointed out, it was the intent between those parties for the Southern policy or the Alumni Association's policy to take priority. Why is that? Well, as Your Honor pointed out, the Alumni Association was the only party to that lease that was required to have insurance on the Ogletree House. No requirement on USM. USM was required to be an additional insured under that policy. And even though it wasn't done, that is an expression of intent that the Alumni Association's policy is to take priority. Third is the repairs. Now, the Alumni Association did have an obligation to make repairs. That's why they took out the policy. I'm sure this wouldn't happen for obvious reasons. But, I mean, as Judge Barksdale said, the real problem, the reason we're here, is because the Alumni Association did not follow through on its promise to name the university as an additional insured. I mean, the university could sue the Alumni Association. That's not going to happen. But there is a remedy there for the fact that that wasn't done. That would be the remedy for suing for a breach of the lease agreement. Your Honor, we took an assignment with the Alumni Association's claim. Whether or not the university has a cause of action is something totally separate and apart from the obligation of Southern to honor its insurance policy to its insured. They did nothing. Instead of, remember, all the we wills, we wills, we wills, all their contractual obligations to the Alumni Association, instead of adjusting the claim for their insured, what they did is they went over to AFM and said, well, we'll throw in a little money, try to work something out with you. Well, that was at a time that no claim had been made on the AFM policy. And not only that, Southern owed AFM no duties. It had no obligation to them. They ignored their duties to their insured. And if they had simply done what they were required to do, we wouldn't be here as well. One final point about whether or not the lower court should have looked at the lease is that the valuation provision says that if the Alumni Association does not promptly make repairs, we're going to value your claim in accordance with a formula tied into that lease. That policy, the Southern policy, incorporates that lease by reference. It pulls the lease into the policy. And that's an additional ground why the lower court should have looked at the lease, as we argued. The lease says that the Alumni Association needs to get coverage. It doesn't say they're going to be the exclusive provider of coverage. So even if you're right that we can look at the lease, why does that mean your client's off the hook? Because, Your Honor, well, first, the cases supporting the general principle that I'm advocating, none of those cases hold that a specific party in the underlying contract insured was to provide exclusive coverage. All these courts did was look what was the intention of the insurers in the underlying contract with respect to which of their insurers should take priority. And our argument is that the lease agreement, and specifically because the lease was pulled into the Southern policy,  University and Alumni Association, to make the Southern policy primary or priority. Priority-wise, they go first. And I have three minutes left. Just very, very briefly, we are asking the court to make the Southern policy first in priority, and because they've breached the policy, and our client now has the assignment, there's not going to be any double recovery, Judge Costa, as you pointed out, and not apply the harsh and inequitable portion. The other insurance clauses, that is the one thing both sides agree on in this bill. Both sides agree that the other insurance clause has no application. That was advocated in the court below, the lower court, felt compelled to apply the other insurance clause. So you're agreeing that clauses are mutually repugnant? No, sir. Because they don't even apply because of the priority argument I just made. Now, if this court should hold that there is no priority, then we would have to agree with your honor that they would be mutually repugnant. But that is only if both policies apply equally, and I hope I adequately argued the point that Southern's policy takes priority because of the expression of intent between the university and the Alumni Association in the least. Regarding that. Well, do you agree that if the policy, if the clause, if the other insurance clauses are mutually repugnant, then you apply the pro rata rule? It's how the pro rata is applied. Well, first, though, I know that, but my first question is, if we find they are mutually repugnant, then the pro rata rule applies. There's no other way to do it. All right. Your position is if we're going to apply pro rata, we should apply your evaluation of the House and Southern Insurance's evaluation. That's correct. That's correct. In that respect, this is a case of first impression. All of the cases cited by, and also going back to the priority thing, you've got that Connex Minolta case that I think answers the question. But this is a case of first impression because it's a case of first party property insurance where a court looked at blanket limits versus specific limits. First time. It's being an issue of first impression, why didn't you seek certification to the state Supreme Court? Because to us it was so clear that you compare risk to risk. That's what the cases hold. You compare risk to risk. What was the risk? The risk was the Ogletree House. Why should Southern get the benefit of comparing the risks on every other building insured under the AFM policy? Keep in mind it wasn't just the Hattiesburg campus that was insured. This policy insured all of the campuses owned by USM in other locations. And why should they have the benefit of allocating risks on other buildings instead of the specific risk of the Ogletree House? Now the repugnancy doctrine, Judge Barksdale, in and of itself is an equitable doctrine. It arose out of the fact that we're under the terms of other insurance clause. Either insurer is saying we don't know it because of our other insurance clause. The court said that is too harsh a result because you have an obligation to pay your insurer in accordance with the policy. Your time has expired now. Thank you. Thank you, Mr. Webb. You've saved time for rebuttal. Excuse me. Judge Barksdale, follow-up on your question. I hurriedly read through Mr. Hamilton's affidavit about the question you asked in my opening argument. Yes, sir. And I found I didn't find anything in there. I don't believe that I recall—well, I know that neither AFM nor USMAA have made any claim against my client arising out of that in the same way that they have not made a claim against any broker or agent that I'm aware of. From my client's standpoint, all we know is we issued a policy, delivered it to them, and the policy is the policy and remained as such. With respect to the specific versus general point that my friend Mr. Curry was making, the case that he's talking about really— You know, every time a lawyer during an oral argument refers to the other side as my friend, it makes my ears kind of prick up like a horse. It's getting nervous. We are friends. Well, I don't doubt it, but I'm looking for some quick punch after that. Oh, no, sir. Go ahead. We actually hugged when I walked in the courtroom. Good, good. The question is would you hug going out? I suspect we would. The specific versus general point, the case that's relied on just simply doesn't apply. That was a blanket policy over a specific policy on the same interest. We don't have that situation here. But most importantly, the mere fact that AFM may have an underwriting issue that it needs to address about how it wrote its policies, not something for us to resolve or for this court to resolve for them. It has been the law. They used the valued policy statute in their brief as an attempt to justify their position on the general and say how absurd this would be if one of the buildings burned down and they had to pay a half a billion dollars. Well, the valued policy statute has been in the books in Mississippi since about 1898. Going back to cases in the early 20th century, the court has been invariably insistent on forcing an insurance company, if a fire occurs to a building, if you write it, you pay for it. I recall Judge Barber had a case where he required Foremost Insurance Company to pay about $400,000 on 29 mobile homes that just happened to be damaged out on a lot because they'd all insured collectively under one policy. Lowry v. Foremost is the name that I remember. But Judge Costa asked the question earlier, too, about what would it matter if the assignment was valid. And one of the key elements that's laid out in the briefing by AFM or USMAA or both is the statement at its own page 9 of the brief, the Alumni Association and their quotes around it, will pay the university for repairs performed and the university will repay it, affiliated AFM for repair funds advanced to the university for payments made in connection with the losses that pertains to the old treehouse. However, in response to interrogatories in this case, USMAA said it had no knowledge of any such agreement. The question is in Record 1106-1107, addressed to USMAA, says, Do you have any agreement with the University of Southern Mississippi or affiliated AFM Insurance Company with regard to payment or repayment for repairs to the Ogletree House related to the tornado event of February 10, 2013? If so, please identify the following, a full description of the agreement, witnesses to such document, any documents related to such agreement. The answer is very short. It says on Page 1107, The defendant is not aware of such an agreement. That was filed in this court on December 19, 2014. Excuse me, filed in the lower court on December 19, 2014, which was from May to December after substantial completion had occurred on this project. And it was nearly six months after the alleged assignment and waiver and agreement by USMAA to stay in the case had occurred. And at that time, there was no such agreement. And to the extent that there is a position urged that would suggest, Your Honors, that USMAA could or could not keep whatever they, if we're required to pay something, they say they have no agreement. You know, I'm personally a member of the Alumni Association. I frankly would like for them to keep the money because I went to Southern Undergraduate School. I'm not so sure how Mr. Curry and Mr. Montgomery would negotiate that at this point. But in any event, they have the right to keep it. And they can keep it under their position in this case in the lower court. That has never changed. And in the context of the argument overall, I go back to, it's kind of like the old song about all roads lead to Rome. If the valuation condition in this policy that says that nothing, the valuation of tenants' improvements and betterments is nothing if others' pay applies, my client owes nothing. And if my, to USMAA, in the record, and we cited in our brief repeatedly. So you, of course, reject the argument that you shouldn't be able to invoke that clause after you had breached. Your position is that you had not breached at that point? That is correct, Your Honor. We had not breached the contract. We were dealing with our insurance at all that point in time. There was never any indication from our insurer that repairs were not going to be made. They just never followed through and provided us the information that would have been necessary for us to write the checks. And then, unbeknownst to us until we found out shortly afterward, USM agreed to pay. And we had to deal with that reality, that they were locked in to pay the entire thing. There is no, and the whole point of this is there is under our policy no uncompensated loss, as to USMAA. And there was not at the time they made the assignment. They had no dog in the hunt at the time they made the assignment. If they had no dog, they couldn't give a dog away, I mean literally, to use their then counsel's metaphor. But here, the entire policy is written on the basis of this, you repair it. If you go back, some of the earlier cases out of New York, we cited one, I think it's 1926. All this stuff about intent and the lease agreement arose in the context of arguments made when policies were not clear to relegate what happens when others make repair. Why didn't you seek certification? I was surprised you would be the appellant in this since you only stuck with about $26,000. But why didn't you seek certification to the State Supreme Court? Because we thought that our provision in our policy was clear. Whatever. All right, thank you Mr. Webb. Your case is under submission. Thank you. Thank you.